**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 20-CR-104-CJW-MAR |
| vs. | **ORDER** |
| SYLVESTER CUNNINGHAM, | |
| Defendant. | |

_____

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................. 3

II.   STANDARD OF REVIEW ................................................................. 3

III.  FACTUAL BACKGROUND .............................................................. 6

IV.   ANALYSIS ..................................................................................... 10

      A.    Motion to Suppress ............................................................. 10

            1.    Walmart Employee's Consent to a Search of the Wheelchair ...... 12

            2.    The Scope of Officer Matthes' Search ............................... 14

            3.    Exigent Circumstances .................................................... 16

            4.    The Seizure ................................................................... 18

            5.    Defendant's Post-Miranda Statements and Search
                  Incident to Arrest ........................................................... 21

       6. Conclusion ………………………………………………………22

B.    Motion to Dismiss ……………………………………………………22

     1.    Which Case Controls…………………………………………28

     2.    Defendant's As-Applied Challenge ………………………………30

V.    CONCLUSION …………………………………………………………33

# I.    INTRODUCTION

This matter is before the Court on defendant's Objections (Doc. 40) to the Report and Recommendation (Doc. 37) of the Honorable Mark A. Roberts, United States Magistrate Judge.  On March 4, 2021, defendant filed a Motion to Suppress (Doc. 15) and a Motion to Dismiss (Doc. 16).  The government timely resisted both motions. (Docs. 22, 23).  On March 22, 2021, Judge Roberts held a hearing on the motions and requested supplemental briefing from the parties.  (*See* Doc. 24).  The parties submitted supplemental briefing (Docs. 25, 26, 27), and on April 29, 2021, Judge Roberts issued his Report and Recommendation ("R&R"), recommending that the Court deny defendant's motions.  (Doc. 37).  On May 13, 2021, defendant timely filed his objections to the R&R.  (Doc. 40).

For the following reasons, the Court **sustains in part and overrules in part** defendant's objections, **adopts** Judge Roberts' R&R with modification, and **denies** defendant's Motion to Suppress and Motion to Dismiss.

# II.    STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements).  While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask.  Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not

> preclude further review by the district judge, sua sponte or at the request
> of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate [judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district court's required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control

over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full de novo review" if the record is concise. *Id.* Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation

when the district court is "left with a definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

### III. FACTUAL BACKGROUND

Defendant "generally accepts the factual findings" as recited in Judge Roberts' R&R, with three notable exceptions: (1) the finding that Officer Matthes was the sole officer present at the scene, (2) the finding that Officer Matthes "did not know the extent of Defendant's disability at the time of the seizure," and (3) the finding that Walmart manager Lisa Schmitt's act of pointing at defendant's wheelchair constituted consent to search the wheelchair. (Doc. 40, at 1–2). Although defendant styles this third objection as a factual objection, it has more to do with Judge Roberts' legal conclusion about what

behavior constitutes consent to search in this context. Accordingly, the Court will address this objection in the sections below.

Defendant's other factual objections are overruled. These objections relate to facts that are crucial to Judge Roberts' finding that exigent circumstances existed to seize the weapon *at the time of the seizure* because "Officer Matthes was the only officer on scene and did not know the extent of Defendant's disability." (Doc. 37, at 23). The Court emphasizes the temporal framing of Judge Roberts' finding because it is crucial to whether the findings are factually accurate. Defendant correctly points out that another officer arrived on scene approximately 90 seconds after the seizure. (Doc. 40, at 1). At the time of the seizure, however, Officer Matthes was the sole officer on scene. Defendant's first objection is therefore **overruled**.

Defendant also correctly notes that there was at least some indication of defendant's disability observable by Officer Matthes. At the time of the seizure, Officer Matthes had observed the wheelchair, but also saw defendant seated in a motorized shopping cart some distance away from his wheelchair. Officer Matthes therefore had reason to believe that defendant suffered *some* degree of disability and certainly had no reason to doubt that defendant was disabled. There is a vast distinction between having knowledge of a disability and fully comprehending the extent of a person's disability. At the time of the seizure, for example, Officer Matthes had no way of knowing whether defendant was able to return to his wheelchair under his own strength. Defendant's second objection is therefore **overruled**.

After reviewing the record, the Court finds that Judge Roberts accurately and thoroughly summarized the relevant facts in his R&R. (Doc. 37, at 4–8). Thus, the Court adopts and incorporates the R&R's factual findings without modification.

> The instant motions arise from Defendant's alleged possession of a firearm at a Walmart store in Southwest Cedar Rapids on August 7, 2020. Defendant's possession of the firearm in question, a [Weihrauch] Hermann

.357 caliber revolver, is made illegal, according to the indictment, by virtue of his following convictions:

1. Driving under the influence of alcohol, in the Circuit Court for of [sic] the 14th Judicial Circuit, Henry County, Illinois, on or about April 21, 2005, in case number 04CF160; and

2. Being a prohibited person (felon) in possession of a firearm, in the United States District Court for the Northern District of Iowa, on or about August 16, 2012 in case number 12-CR-00002.

(Doc. 2 at 1; Doc. 29 at 2.)

Officer Matthes testified to the following facts. I found Officer Matthes to be a credible witness. Other facts are found in the exhibits admitted at the hearing.

At about 11:00 a.m. on August 7, 2020, Officer Matthes was working an extra job assignment at the Walmart store. During these "extra job assignments," police officers are fully uniformed and equipped, including their service weapons and marked police vehicles; however, they are paid by Walmart to provide security, take direction from Walmart, and are considered Walmart employees. Officer Matthes has been an officer with the Cedar Rapids Police Department ("CRPD") for a little under two years and is currently assigned to patrol. Officer Matthes completed her training with the Iowa Law Enforcement Academy and has an associate degree in corrections.

Officer Matthes was in her patrol vehicle preparing to begin her shift when she was approached by a Walmart employee, Penny Spencer, who requested immediate assistance because someone in the store had a gun in a wheelchair. (Matthes Hr'g Test.; Gov. Ex. 1 at 1.) Ms. Spencer had been helping a customer look for a lost cell phone when she lifted up a cushion on the customer's wheelchair and saw the gun. A Walmart manager, Lisa Schmitt, had also seen the gun in the wheelchair.

After this brief conversation, Officer Matthes entered the store and activated her body camera. She approached the area in the vestibule of the store where shopping carts are collected for use by store patrons. Later in the video, it becomes apparent that a store security office is located on the opposite side of the vestibule. As Officer Matthes entered the vestibule, her video showed Ms. Schmitt pointing down at the wheelchair in question. (Def. Ex. 4 at 11:05:52 a.m.) Although Ms. Schmitt stood by the wheelchair, presumably to keep people away from it, the vestibule was bustling with employees and customers, including children.

Defendant was seated in a motorized shopping cart. Defendant's wheelchair appeared to be several feet away from Defendant, but the wide-angle lens of Officer Matthes's body camera makes distances somewhat difficult to judge. When the audio commenced, Officer Matthes was asking Defendant about whether he had a permit to carry a firearm. (*Id.* at 11:06:07-10 a.m.) Defendant denied having a permit to carry a firearm. While digging in his pockets for identification, he denied having a weapon and denied having placed a weapon in the wheelchair. Defendant explained that when he entered Walmart with the wheelchair there was nothing in it or on it. Defendant told Officer Matthes that no one else uses the wheelchair. (*Id.* at 11:07:52 a.m.) Officer Matthes lifted a cushion from the seat of the wheelchair with one hand and removed a revolver from the seat with her other hand. At the time of the seizure, Officer Matthes was the only police officer present. Defendant continued to deny knowledge of the weapon or ever having a permit to carry.

During the ensuing conversation, Defendant admitted that he was currently on federal "probation" for a prior gun conviction. Defendant explained that he had driven to the store and assembled his wheelchair to enter the store. Defendant also explained to Officer Matthes and other CRPD officers who arrived at the scene that he had been paralyzed because of a gunshot. Toward the end of this conversation, Defendant was allowed to transfer from the Walmart motorized cart to his wheelchair, and was then escorted into the store security office on the other side of the vestibule. The remainder of the body camera video shows Officer Matthes's further investigation at the store, including the provision of *Miranda* warnings to Defendant and his decision to remain silent. Defendant was searched incident to his arrest and officers found a blue latex glove containing thirteen individually wrapped bags of cocaine in his undergarment. Officer Matthes had further discussions with store employees and then transported Defendant to the Linn County Correctional Center.

Officer Matthes's report indicates that she later interviewed the Walmart employee who first found the firearm, Penny Spencer. (Gov. Ex. 1 at 1.) Ms. Spencer was working near the front door and had helped Defendant with a motorized shopping cart. Defendant had to switch carts when the first one did not work. Defendant seemed to have misplaced his cell phone when switching carts. He had entered the store on the motorized shopping cart and came back to the vestibule a few minutes later looking for his phone. Defendant then told Ms. Spencer he was going to check his vehicle for his phone. During this time, Defendant left his personal

wheelchair near the front of the store pushed against the wall. According to Ms. Spencer, while Defendant was in the store and switching carts, his personal wheelchair was never out of sight and no one touched it. (*Id.* at 3.) When Defendant went to his vehicle to look for his phone, Ms. Spencer suspected that the phone could have been under the wheelchair's seat cushion. (*Id.*) Ms. Spencer notified Ms. Schmitt that she saw a firearm and Ms. Schmitt then approached the wheelchair and also saw the firearm. (*Id.*)

Defendant was charged with being a felon in possession of a firearm and other offenses related to the possession of controlled substances.

(Doc. 37, at 4–8) (footnotes omitted).

## IV. ANALYSIS

### A. Motion to Suppress

The Fourth Amendment protects people from unreasonable searches and seizures of their person or property. *See* U.S. CONST. amend. IV. Our understanding of what constitutes a search is rooted in two distinct legal foundations: property and privacy. Thus, a search may occur when the government physically intrudes upon "persons, houses, papers, and effects," *Florida v. Jardines*, 569 U.S. 1, 5 (2013), or infringes on an expectation of privacy that society is willing to recognize as reasonable. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). A seizure occurs whenever the government meaningfully interferes with an individual's possessory interest in property. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Warrantless searches and seizures are presumptively unreasonable and therefore precluded by the Fourth Amendment, subject to a handful of "jealously and carefully drawn" exceptions. *Coolidge v. New Hampshire*, 403 U.S. 443, 454–55 (1971) (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958)).

As with any other expectation of privacy, it must yield to a warrant or to recognized exceptions. Additionally, although the Fourth Amendment strictly proscribes government action, "it is wholly inapplicable to a search or seizure, even an unreasonable

one, effected by a private individual not acting as an agent of the [g]overnment or with the participation or knowledge of any government official." *Jacobsen*, 466 U.S. at 113 (internal quotations and citations omitted).

In his motion to suppress, defendant argues that Officer Matthes' search of his wheelchair violated his Fourth Amendment right to be free from unreasonable searches because Officer Matthes did not have consent or a warrant and because no recognized exception to the warrant requirement applies. (Doc. 17, at 3–4). Consequently, defendant argues that not only should the Court suppress the firearm, but also the cocaine found on defendant's person and statements made by defendant subsequent to the discovery of the firearm as fruits of the poisonous tree. (*Id.*, at 5).

Judge Roberts found that defendant had a reasonable expectation of privacy in his wheelchair and that law enforcement required a warrant prior to searching it unless an exception to the warrant requirement applied. (Doc. 37, at 11). Judge Roberts found that the Walmart employee who initially discovered the firearm was not acting as a government agent, that the employee granted consent—at least tacitly—for Officer Matthes to search the wheelchair, and that Officer Matthes did not exceed the scope of the initial search by the Walmart employee when she searched the wheelchair herself. (*Id.*, at 11–19). Because the firearm was obviously contraband and was discovered subsequent to a lawful search, Judge Roberts concluded that Officer Matthes' seizure of the firearm was reasonable under the circumstances. (*Id.*, at 19–22). Judge Roberts further found that the search of the wheelchair and the seizure of the firearm were independently justified by the plain view doctrine or, alternatively, the exigent circumstances exception to the warrant requirement. (*Id.*, at 22–24).

Based on these findings, Judge Roberts found that defendant's post-*Miranda* statements do not constitute fruit of the poisonous tree and should not be suppressed. (*Id.*, at 24–25). Judge Roberts also found, however, that if this Court disagreed with his

conclusion about the initial alleged Fourth Amendment violation, then the statements were not sufficiently attenuated from the alleged violation and should be suppressed. (*Id.*, at 24–30). Similarly, Judge Roberts found that the cocaine found on defendant's person should not be suppressed as fruit of the poisonous tree because it was discovered as a result of a search incident to lawful arrest. (*Id.*, at 30–31). For these reasons, Judge Roberts recommended that the Court deny defendant's motion to suppress. (*Id.*, at 31).

Defendant now lodges six objections to the R&R. Specifically, defendant objects to the finding that (1) Walmart employees consented to a search of his wheelchair, (2) Officer Matthes' seizure of the firearm was reasonable, (3) the search of his wheelchair was justified by exigent circumstances, (4) the seizure was otherwise reasonable, (5) his post-*Miranda* statements should not be suppressed, and (6) the search of defendant incident to arrest was justified and the cocaine found on his person should not be suppressed. (Doc. 40, at 2–3). The Court will address each objection in turn.

### 1.     *Walmart Employee's Consent to a Search of the Wheelchair*

In his post-hearing supplemental brief, defendant argued that Officer Matthes did not have a right to search the wheelchair because the Walmart employee did not consent to the search (Doc. 27, at 4–5) and reasserts that argument in his objection to the R&R. In support of its argument against suppression, the government argued that the Walmart employee acted in a private capacity and was therefore not constrained by the Fourth Amendment, citing *United States v. Jacobsen*, 466 U.S. 109 (1984), *United States v. Miller*, 152 F.3d 813 (8th Cir. 1998), and *United States v. Starr*, 533 F.3d 985 (8th Cir. 2008). (Doc. 23, at 4-6).

Defendant's argument appears to conflate two similar but distinct threads of Fourth Amendment jurisprudence, namely, the private search doctrine and the third-party consent doctrine. The private search doctrine holds that a search conducted by a private individual not bound by the Fourth Amendment frustrates a person's expectation of

privacy to some degree and justifies an identical warrantless search by law enforcement. *Jacobsen*, 466 U.S. at 117. *Jacobsen* involved drugs discovered in a package by FedEx employees, *Miller* dealt with a search of a defendant's room at a halfway house after employees of the halfway house discovered contraband in defendant's room, and *Starr* addressed evidence delivered to law enforcement by the defendant's wife. The third-party consent doctrine has evolved over the years, but the generally accepted theoretical basis for the proposition that someone other than the defendant can consent to a search is that the third party exercises some common authority over the place or item searched. *See United States v. Matlock*, 415 U.S. 164 (1974); *but see Chapman v. United States*, 365 U.S. 610 (1961) (describing the rule having commonality with, but being broader than, traditional property law); *Stoner v. California*, 376 U.S. 483 (1964) (analogizing the third-party relationship to an agency relationship).

These cases are distinguishable from the instant case in that they all involve a degree of control or authority exercised by the third party over the evidence at issue. No such common authority or control existed here. Defendant did not leave his wheelchair in the custody of Walmart, as did the defendant in *Jacobsen* when he shipped his package via FedEx. Nor did Walmart possess any legal authority to access defendant's wheelchair as did the third-party halfway house employees in *Miller*. Nor could Walmart claim to have a joint right to access defendant's wheelchair or possess the items therein as could the third-party spouse in *Starr*. The mere physical presence of defendant and his wheelchair on Walmart property is insufficient to confer any authority to Walmart to consent to a search of defendant.

Defendant's focus on the issue of consent is misplaced, however. The right of law enforcement to conduct a search under the private search doctrine flows not from the consent of the private searcher but from the destruction of defendant's expectation of privacy occasioned by the private search. Thus, the only question at issue in a private

search case is whether law enforcement expands the scope of the private search into areas where the expectation of privacy has not already been frustrated. *Id.* Indeed, the holding in *Miller* was expressly predicated on a repudiation of the parties' third-party consent arguments. 152 F.3d. at 815 (ignoring parties' briefing on third-party consent and exercising discretion to *sua sponte* analyze appeal under private search rule). Accordingly, to answer the question of whether the Walmart employee consented to a search of defendant's wheelchair would bring the Court no closer to determining the constitutionality of the search.

As a factual matter, however, the Court agrees with Judge Roberts' conclusion that the Walmart employee's actions were clearly intended to signal to Officer Matthes that she had the Walmart employee's permission to search the wheelchair. The employee alerted Officer Matthes to the presence of the firearm, walked Officer Matthes directly to the location of the firearm, and gestured quite insistently to the seat of the wheelchair as if to say, "Here it is, please do something about it." (Gov't Ex. 4). Thus, to the extent that consent from the Walmart employee was necessary, Officer Matthes obtained consent, albeit nonverbally. Defendant's objection on this ground is **overruled**.

### 2. *The Scope of Officer Matthes' Search*

In his R&R, Judge Roberts found that Officer Matthes did not exceed the scope of the private search conducted by the Walmart employee and therefore did not violate defendant's Fourth Amendment rights. (Doc. 37, at 15–18). Defendant objects to this finding arguing that Officer Matthes exceeded the scope of the private search when she "touched, picked up and seized the firearm, exercising dominion and control over the firearm." (Doc. 40-1, at 4).

Under the standards of the private search rule, the issue of the scope of Officer Matthes' search is of critical importance. *See Jacobsen*, 466 U.S. at 115 (holding that subsequent invasion of privacy by government is limited by the extent of the initial private

search).  Defendant's argument again stems from a conflation of doctrines, however. The distinction between a search and a seizure—perhaps a narrow one in this case, factually speaking—is of profound legal significance.  Officer Matthes undoubtedly searched defendant's wheelchair when she lifted the cushion and visually observed the firearm.  Defendant correctly notes that at the point when Officer Matthes lifted the seat of the wheelchair and observed the firearm she had not yet exceeded the scope of the initial private search.  (*Id.*).  Defendant then claims that Judge Roberts "bootstraps that finding into a conclusion that the firearm, now being in plain view, was properly seized by Officer Matthes" and asserts that the touching and handling of the firearm is part of the search.  (*Id.*).

This argument elides the crucial distinction between a search and a seizure and overlooks the important practical concerns faced by law enforcement when confronted with a firearm.  Unlike the search conducted in *Jacobsen*, the physical handling of the firearm was not intended to further any investigatory aims.  The discovery of a firearm is a very different matter than the discovery of "mere evidence."  *See Warden of Maryland Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967) (holding that the seizure of otherwise innocuous items that may have evidentiary value requires a showing of probable cause).

Because Officer Matthes initiated the search under the suspicion of the presence of a firearm and then did in fact discover a firearm, the private search doctrine is not an especially apt framework to challenge the search and seizure.  In any event, the search performed by Officer Matthes consisted of no more than the elevation of the seat cushion and in that respect did not exceed the scope of the private search performed by the Walmart employee.  As the Court will discuss below, the actual seizure of the firearm is more properly analyzed in the context of *Terry v. Ohio*, 392 U.S. 1 (1968), but insofar

as a private search was involved, Officer Matthes did not exceed the scope of that search. Defendant's objection on this ground is **overruled**.

### 3.     *Exigent Circumstances*

Judge Roberts found that Officer Matthes' seizure of the firearm was lawful because (1) "seizing contraband that a legal search has revealed is not an illegal seizure," (2) the plain view doctrine applies, and (3) exigent circumstances justified the seizure. (Doc. 37, at 22–23).   Defendant does not specifically object to the first two findings. Rather, he specifically objects to the third finding that exigent circumstances justified the seizure and then generally objects to the conclusion that the seizure was reasonable. (Doc. 40, at 2).   The Court interprets this to mean that defendant asserts that the seizure was unreasonable because Judge Roberts erred in finding exigent circumstances present.

The Court reviews specific objections *de novo* because they direct the Court "to a specific error in the [M]agistrate [J]udge's proposed findings and recommendations." When objections are "[c]onclusory" and "do not direct the reviewing court to the issues in controversy," then a district court reviews the Magistrate Judge's findings for clear error.   *Velez–Padro v. Thermo King De Puerto Rico, Inc.*, 465 F.3d 31, 32 (1st Cir. 2006); *see also Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994); LCrR 59 (requiring "specific, written objections to" a Magistrate Judge's R&R).   The Federal Rules require a district court judge to address only specific objections to a magistrate judge's report and recommendation.   *Cf.* FED. R. CIV. P. 72 (requiring the court to review de novo any portions of the report and recommendation to which a specific written objection has been made).   Appellate courts have affirmed district courts' denial of de novo review when a party's objections lack specificity.   *See, e.g.*, *United States v. Prather*, 79 F. App'x 790, 792 (6th Cir. 2003).   A "bare statement, devoid of any reference to specific findings or recommendations to which [defendant] objected *and why*, and unsupported by legal authority, [is] not sufficient" to constitute an objection.   *Mario v. P & C Food Markets,*

*Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) (emphasis added); *Thompson v. Nix*, 897 F.2d 356, 357–58 (8th Cir. 1990) (reminding parties that "objections must be timely and specific to trigger de novo review by the District Court of any portion of the magistrate's report and recommendation."). Accordingly, the Court reviews Judge Roberts' first two findings regarding the seizure for plain error. Finding none, the Court adopts Judge Roberts' conclusions that the seizure of contraband found subsequent to a legal search does not violate the Fourth Amendment and, alternatively, that the plain view doctrine justified the seizure here.

Either of Judge Roberts' first two findings would independently justify the seizure of defendant's handgun. Defendant's objection to the third finding—that exigent circumstances justified the seizure—is therefore moot to some extent. Even if the Court sustained defendant's objection and found that exigent circumstances did not exist at the time of the seizure, the ultimate conclusion that the seizure was reasonable would remain undisturbed. Exigent circumstances did exist, however, and for the following reasons the Court denies defendant's objection.

Judge Roberts found that the circumstances which confronted Officer Matthes in the Walmart vestibule on August 7, 2020, constituted grounds for excepting her behavior from the regular constraints of the Fourth Amendment. (Doc. 37, at 23–24). Specifically, Judge Roberts found that at the time of the seizure (1) the area was busy with employees, shoppers, and children, (2) Officer Matthes was the only officer on scene, (3) Officer Matthes did not know the extent of defendant's disability. (*Id.*) (citing *United States v. Wells*, 702 F.2d 141, 144 (8th Cir. 1983)). Acting on a tip from a bartender, the law enforcement officers in *Wells* seized a firearm hidden in a brown paper bag underneath a table in a bar. *Wells*, 702 F.2d at 142–43. The district court held that this seizure was reasonable, finding that the officers possessed at least a reasonable suspicion that the defendant was in possession of a firearm and that the need to ensure

the safety of the officers and members of the public constitute exigent circumstances. *Id.* at 144. The Eighth Circuit Court of Appeals affirmed this conclusion. *Id.*

Here, Officer Matthes was informed of the presence of a firearm by an eye witness. The dangerous nature of the firearm was immediately apparent, and Officer Matthes took reasonable measures to ensure her safety and preserve the status quo at the scene. *See Adams v. Williams*, 407 U.S. 143 (1972) (holding that police may seize a firearm from defendant even where the presence of a firearm was not apparent and police only knew of its existence based on informant's tip). Given the circumstances at the scene, the exigent circumstances exception to the warrant requirement justified the seizure of the firearm from defendant's wheelchair. Neither defendant's physical distance from the handgun nor his as-yet unspecified degree of disability degrades the reasonableness of Officer Matthes' decision. *See United States v. Antwine*, 873 F.2d 1144, 1147 (8th Cir. 1989) (finding exigent circumstances to enter house and seize firearm for safety of children present after defendant was arrested). Here, as in *Antwine*, Officer Matthes' "search did not exceed what was necessitated by the exigency. It is significant that [she] did not look for [other items of contraband but rather] simply located the gun and seized it." 873 F.2d at 1147. Thus, the seizure of the firearm was justified by the exigent circumstances exception to the warrant requirement. Defendant's objection on this ground is **overruled**.

### 4. *The Seizure*

As discussed above, even if exigent circumstances were not present, the seizure of defendant's firearm would be reasonable under either of Judge Roberts' alternative findings. The Court takes this opportunity to introduce a third alternative that is more apt given the factual circumstances present here.

A law enforcement officer armed with reasonable suspicion that criminal activity may be in progress may stop a person to investigate the suspected criminal activity.

18

*Terry*, 392 U.S. at 25–31.  Although considered a seizure for Fourth Amendment purposes, such a warrantless stop is justified in light of its minimally intrusive nature and the reasonable suspicion of the officer.  *Id.*  To justify a so-called *Terry* stop, the officer "must be able to point to specific and articulable facts which, taken together with the rational inferences drawn from those facts, reasonably warrant that intrusion."  *Id.* at 21.  Incident to the *Terry*-style seizure of a person suspected of criminal activity, an officer may conduct a search for weapons for the sole purpose of protecting herself and other officers during the investigation, and only if the officer has reason to believe the subject of the stop is armed.  *Id.* at 28.  Such a search must "be strictly circumscribed by the exigencies which justify its initiation."  *Id.* at 26.  In other words, the intrusion must be executed in a manner reasonably calculated to locate weapons and must not devolve into a general search.  *Id.*

The principles elucidated in *Terry* have since been extended beyond the pedestrian/beat cop context.  Reasonable suspicion may justify the seizure of a moving vehicle and its occupants, *United States v. Cortez*, 449 U.S. 411, 417–418 (1981), a subsequent search of the vehicle for weapons, *Michigan v. Long*, 463 U.S. 1032, 1049–50 (1983), the seizure not only of weapons but of contraband discovered incident to the search, *id.*, as well as additional measures taken to ensure officer safety and maintain the status quo during the stop—such as placing the suspect in handcuffs.  *United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999).  Officers may take all of these measures absent the level of evidence required to justify a formal arrest of the suspect, so long as such measures are carefully calculated to ensure officer safety and are supported by reasonable suspicion.

Here, an eyewitness alerted Officer Matthes to the presence of a firearm concealed in defendant's wheelchair.  The witness, a uniformed Walmart employee, was visibly agitated and conveyed her concern about the safety of staff and patrons.  Although she

could not be sure at the time, it was reasonable for Officer Matthes to credit the employee's assertion as true. Given the public nature of the scene and the potential for serious harm, Officer Matthes was under no obligation to presume defendant's possession of the firearm was lawful and was fully entitled to investigate further to rule out criminal conduct. Based on the reasonable suspicion established by the eyewitness, it was reasonable for Officer Matthes to suspect the presence of weapons both in defendant's wheelchair and on defendant's person, necessitating a search of both. Once she confirmed the presence of the firearm, it was reasonable for Officer Matthes to seize the firearm to protect herself and others at the scene, at least until she could confirm that defendant was carrying lawfully.

Defendant suggests that Officer Matthes should have "guarded" the wheelchair until a warrant could be obtained. (Doc. 40-1, at 7). Setting aside the practical pitfalls of denying a disabled person access to their wheelchair indefinitely while awaiting a warrant—particularly when that person may in fact be innocent of criminal conduct—Officer Matthes was under no obligation to elect any one particular reasonable course of action when several are available. The reasonable suspicion standard implicitly contemplates the possibility of multiple acceptable courses of action and is expressly structured to allow responding officers the flexibility to exercise their own judgment in the face of multifarious and often quickly shifting factual situations. To pass constitutional muster, Officer Matthes' intrusions into defendant's privacy must only have been reasonable in their own right. That defendant can conceive of alternate reasonable possibilities after-the-fact is simply not relevant. The search of the wheelchair and seizure of the firearm were reasonable steps taken to ensure officer safety and maintain the status quo at the scene while Officer Matthes investigated suspected criminal activity. Thus, the Court further finds that the seizure of defendant's firearm was justified under *Terry*

and its progeny, irrespective of any other exception to the warrant requirement. Defendant's objection on this ground is **overruled**.

### 5. *Defendant's Post-Miranda Statements and Search Incident to Arrest*

Defendant initially moved to suppress statements he made after Officer Matthes seized the firearm and the cocaine found on his person after officers arrested him. (Doc. 15; Doc. 17, at 5). In light of his findings *vis-à-vis* the search and seizure, Judge Roberts found that the statements were not fruit of the poisonous tree and that the cocaine was discovered as the result of a search incident to a lawful arrest. (Doc. 37, at 24–25, 30–31). Accordingly, the statements and cocaine should not be suppressed. (*Id.*).

In the event the Court disagreed with his findings, Judge Roberts went on to analyze defendant's statements under the attenuation doctrine. (*Id.*, at 25–29). Judge Roberts concluded that if the search and seizure were ultimately found to be unconstitutional, then defendant's statements were not sufficiently attenuated from the seizure and should be suppressed. (*Id.*, at 29–30). Similarly, he found that the search incident to arrest would not save the discovery of the cocaine because the arrest would not then be lawful. (*Id.*, at 30–31).

In his objections, defendant addresses these findings but does not necessarily object to them. (Doc. 40, at 9). Defendant merely reiterates Judge Roberts' conclusions and emphasizes that if Officer Matthes' search of his wheelchair and seizure of his firearm violated the Fourth Amendment, then his subsequent statements and the cocaine discovered on his person should also be suppressed. (*Id.*).

The Court has already found that Judge Roberts' findings with respect to the search and seizure were not in error. Because defendant does not raise any new objection to Judge Roberts' findings or object at all to Judge Roberts' conclusions on the attenuation of defendant's statements or the search incident to arrest, the Court reviews these findings

for clear error. Finding none, the Court adopts Judge Roberts' recommendations without modification.

### 6. Conclusion

For the reasons described above, defendant's objections to the R&R (Doc. 40) are **overruled**. The Court adopts Judge Roberts' R&R (Doc. 37) and modifies it to include the Court's analysis under *Terry v. Ohio*, 392 U.S. 1 (1968). Defendant's motion to suppress is **denied**. (Doc. 15).

### B.    Motion to Dismiss

Defendant also moved to dismiss the indictment on the ground that the enforcement of Section 922(g)(1) is unconstitutional as applied to him because it denies him the right to bear arms for the purpose of self-defense. (Doc. 16-1, at 14). To be sure, there are undoubtedly some circumstances where the application of Section 922(g) could be unconstitutional, *see Miller v. Sessions*, 356 F. Supp. 3d. 472, 481–484 (E.D. Penn. 2019), and the Eighth Circuit Court of Appeals has left open the possibility of such an outcome. *United States v. Woolsey*, 759 F.3d 905, 909 (8th Cir. 2014). Defendant's circumstances here do not fit the bill, however.

"Both the text and history" of the Second Amendment leave "no doubt" that Americans enjoy "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). The "core protection" guaranteed by the Second Amendment is the right to self-defense. *Id.* at 630, 634. This right is fundamental and applies with equal force against federal, state, and local governments. *McDonald v. City of Chicago*, 561 U.S. 742, 750, 778 (2010). Although the right to bear arms is at its zenith within the home, the precise contours of the Second Amendment have yet to be definitively delineated. *See Heller*, 554 U.S. at 635 ("[W]hatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the

right of law-abiding, responsible citizens to use arms in defense of hearth and home."). In dicta, the Supreme Court emphasized that:

> Like most rights, the right secured by the Second Amendment is not unlimited. . . . Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27. Characterizing such regulations as "presumptively lawful," the Court did not undertake a comprehensive analysis of how, why, whether, or by whom such a presumption may be overcome. *Id.* at 627 n.26; *see also McDonald*, 561 U.S. at 758 (Alito, J., writing for the plurality) (holding that the Second Amendment constrains state behavior through the Due Process Clause of the Fourteenth Amendment); *id.* at 805–58 (Thomas, J., concurring in part and concurring in the judgment) (arguing that the Second Amendment is enforceable through the Privileges and Immunities Clause).

Guided only by the Supreme Court's admonition that some longstanding restrictions are presumptively lawful—and by the Court's assurance that the Court would "expound upon the historical justifications for the exceptions" it references if and when those exceptions come before the Court, *Heller*, 554 U.S. at 635—lower courts have struggled to develop and implement a coherent, workable standard when addressing Second Amendment challenges. *See Binderup v. Attorney General of the United States of America*, 836 F.3d 336, 387 (3d Cir. 2016) (Fuentes, J., concurring in part) (examining disparate circuit rulings and concluding that "federal judges face an almost complete absence of guidance from the Supreme Court about the Scope of the Second Amendment right."). In the absence of a concrete standard or authoritative analysis of the many extant firearms regulations, most circuits have adopted a two-step approach

where the court first asks whether the law in question imposes a burden on conduct protected by the Second Amendment. If it does, the court then applies some form of means-end scrutiny. *See Adams*, 914 F.3d at 610 (Kelly, J., concurring in the judgment) (collecting cases and describing tests applied in Third, Fourth, Fifth, Sixth, Seventh, Ninth, Tenth, and Eleventh Circuits).

Ordinarily, the Government bears the burden of proving that the regulated activity is not protected by the Second Amendment. "If the government demonstrates that the challenged statute 'regulates activity falling outside the scope of the Second Amendment . . . then the analysis can stop there." *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (citing *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011)). By contrast, the presumptive lawfulness of some regulations as described in *Heller* shifts the burden at this first stage to the defendant. *Binderup*, 836 F.3d at 347.

The Third Circuit's approach is instructive when it comes to Second Amendment challenges to those "longstanding" laws *Heller* characterized as presumptively lawful. First, the court asks "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States v. Marzarella*, 614 F.3d 85, 90 (3d. Cir. 2010). To succeed at the first step of this analysis, a defendant "must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Binderup v. Attorney General of the United States*, 836 F.3d 336, 347 (3d Cir. 2016) (citing *United States v. Barton*, 633 F.3d 168, 173–74 (3d Cir. 2011)). Step one therefore contains "two hurdles that an individual presumed to lack Second Amendment rights must overcome to rebut the presumption." *Id*. at 346.

Once a defendant rebuts the presumption in favor of the lawfulness of the challenged regulation as described in *Heller* at step one, the court then evaluates the law

"under some form of means-end scrutiny." *Marzarella*, 614 F.3d at 90. The court must then test "the law or regulation under heightened scrutiny at step two." *Id.* Under any form of heightened scrutiny, the government—not the defendant—is compelled to justify its regulation by citing its interest in promulgating the regulation and the extent to which the regulation actually addresses that interest. *See, e.g.*, *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440–41 (1985) (describing strict and intermediate scrutiny standards).

When addressing the constitutionality of Section 922(g) as applied to any particular defendant, the Eighth Circuit Court of Appeals has adopted a somewhat unique approach. Rather than engage in the fulsome analysis describe above, the Eighth Circuit does not fully analyze a defendant's claim when the claim fails any of the hurdles at step one. *See United States v. Brown*, 436 F. App'x 725, 726 (8th Cir. 2011) (per curiam) (unpublished) (citing *Barton*, 633 F.3d at 174). In *Brown*, law enforcement officers executing an arrest warrant located a handgun underneath defendant's bedroom mattress. *Id.* The court, quoting directly from *Barton*, denied defendant's as-applied challenge on the grounds that the defendant failed to present "'facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections.' He does not allege, for example, that his stipulated prior felony was for a non-violent offense or that he is 'no more dangerous than a typical law-abiding citizen.'" *Id.* After finding that the defendant did not overcome the *Barton* hurdles the court held that the defendant's "assertion that he possessed the gun for self-defense is insufficient to successfully challenge his conviction under the felon in possession statute." *Id.* The court reached this conclusion despite the fact that the defendant possessed the firearm in his home where Second Amendment protections are at their height and without any further discussion about the core right protected by the Second Amendment or governmental interests at work in Section 922(g)(1).

It must be noted that although the Eighth Circuit imported some language from *Barton* quoted above, *Barton* itself did not establish its own framework for as-applied challenges to Section 922(g)(1). As the Third Circuit later clarified, *Barton* and its predecessor case, *United States v. Marzarella*, 614 F.3d 85 (3d. Cir. 2010), taken together, establish the "framework for deciding as-applied challenges to gun regulations" in the Third Circuit. *Binderup v. Attorney General of the United States*, 836 F.3d 336, 346 (3d Cir. 2016). *Brown* is unpublished and is therefore not afforded precedential weight. The same rationale that undergirded the decision in *Brown*, however, provided principle support for the court's conclusion in *Woolsey* three years later. Although the circumstances of the defendant in *Woolsey* differed greatly from those encountered in *Brown*, the court again declined to further analyze the competing rights and interests involved in the application of Section 922(g)(1). Instead, the court "left open the possibility that a person could bring a successful as-applied challenge to" Section 922(g)(1) but rejected the defendant's as-applied challenge there due to his multiple violent felony convictions. 759 F.3d at 909. The court took into account both that these were violent crimes and that defendant had "not shown that he is 'no more dangerous than a typical law-abiding citizen.'" *Id.* (citing *Brown*, 436 F. App'x at 726).

Taken in the context of the Eighth Circuit's prior decisions, *Adams* is something of an aberration. Charged under Section 922(g)(1), the defendant in *Adams* moved to dismiss the indictment as unconstitutional as applied to him, arguing that the Second Amendment prohibits a permanent, categorical ban on firearm possession by felons. *United States v. Adams*, No. 15-00153-01-CR-W-GAF, 2015 WL 5970548 at *2 (W.D. Mo. 2015). Applying intermediate scrutiny, the district court rejected this challenge, reasoning that Section 922(g)(1) served an important government objective and that defendant's prior felony conviction placed him within the suitably narrow ambit of the

law.[1]  *Id.*  Thus, on its face, the district court appears to have implemented some form of the two-step approach utilized in other circuits.

On appeal, the Eighth Circuit took a different approach, asserting that "to succeed on an as-applied challenge, [the defendant] must establish (1) that the Second Amendment protects his particular conduct, and (2) that his prior felony conviction is insufficient to justify the challenged regulation of Second Amendment rights.  914 F.3d at 605.  The court introduced this previously unused standard without citation, departing from the rationale of other circuits and placing the burden on the defendant at all stages of the analysis.  *Id.* at 608 (Kelly, J., concurring in the judgment).  The court found that because the defendant failed to argue the first prong of this new test, he forfeited his claim on appeal.  *Id.*  Accordingly, the court conducted a limited review under the standard for obtaining relief on a forfeited claim, inquiring not into the merits of the defendant's constitutional argument, but whether the "district court made an obvious error that affected substantial rights and seriously affected the fairness, integrity, or reputation of the judicial proceedings."  *Id.* at 606.  Focusing exclusively on the fact that the defendant was arrested with a concealed weapon, the court found that it was not plain or obvious that the Second Amendment protected such conduct.  *Id.*

Having explored the state of the law in the Eighth Circuit, the Court now turns to the case at bar.  Defendant's objection proceeds in two parts.  First, defendant argues that Judge Roberts improperly distinguished *Adams* from *Woolsey* in deciding which standard to apply.  (Doc. 40-1, at 10).  Second, defendant argues that the *Woolsey* standard is in fact a unique two-part test which, if applied here, would necessitate a finding in his favor.  (*Id.* at 10–11).

---

[1] In *Adams*, defendant's Motion to Dismiss was originally heard by a United States Magistrate Judge whose Report and Recommendation was subsequently adopted by the District Court without modification.

## 1. Which Case Controls

The government argued that this case is controlled by *United States v. Adams*, 914 F.3d 602 (8th Cir. 2019), whereas defendant argued that *Woolsey* controls. (Docs 16-1, 22-1, & 40-1). Judge Roberts correctly noted that unless the cases are distinguishable, the prior decision—*Woolsey*—would override whatever contradictions were introduced by *Adams*. (Doc. 37, at 36) (citing *Free the Nipple – Springfield Residents Promoting Equal. V. Springfield*, 923 F.3d 508, 511 (8th Cir. 2019)). Judge Roberts found that *Adams* is distinguishable from *Woolsey* and that *Adams* is controlling of the factual circumstances here. (Doc. 37, at 41).

Applying the *Adams* standard, Judge Roberts found that defendant has not distinguished his circumstances from others who have been historically barred from carrying firearms and that the Second Amendment does not inhibit application of Section 922(g)(1) to defendant here. (*Id.*, 41–48). Defendant now objects to this finding, arguing that the standard described in *Adams* is inappropriate because it effectively contradicts the prior test established by *Woolsey* without the required authority of an *en banc* panel. (Doc. 40-1, at 10-11). Defendant asserts that the *Woolsey* standard demands a different result than the *Adams* standard and, naturally, defendant urges the Court to apply the former. (*Id.*).

The Court finds that *Adams* is not distinguishable from *Woolsey*. Judge Roberts placed great weight on the fact that defendant here possessed a concealed weapon as did the defendant in *Adams*, whereas the defendant in *Woolsey* possessed the firearm in his home. These factual distinctions justified considering this case within the analytical ambit of *Adams*. Such distinctions may be important to determining the constitutionality of a right to carry law or a concealed carry prohibition, but they are not material to the question of the constitutionality of the blanket prohibition on *all* forms of possession by felons at issue here, however. *See Adams*, 914 F.3d at 608 (Kelly, J., concurring in the

judgment). The "particular conduct" to be analyzed here under the test required by *Adams* is the defendant's possession of the firearm in general, because that is what Section 922(g) prohibits. Examining his conduct with any more granularity than that risks conflating conduct prohibited by the statute with conduct not contemplated by the statute and punishing the defendant for conduct for which he is not charged. "There is no precedent requiring [a defendant] to prove that every aspect of his conduct was constitutionally protected" in order to prevail on an as-applied challenge. *Id.* Thus, the only question to be asked with respect to a defendant's conduct relevant to an as-applied challenge to Section 922(g) is whether the defendant possessed the firearm for purposes of self-defense.

By introducing a previously unused test, interpreting that test to demand a detailed inquiry into minute aspects of the defendant's conduct that fall outside the scope of the statute, and then placing the burden of production entirely on the defendant, the *Adams* standard represents a significant departure from how the Eighth Circuit Court of Appeals has addressed as applied challenges to Section 922(g) post-*Heller*. With the exception of *Adams*, every as-applied challenge to Section 922(g)(1) addressed in the Eighth Circuit since *Heller* has applied the factors first introduced in *Brown* and later used in *Woolsey*. *See United States v. Hughley*, 691 F. App'x 278, (8th Cir. 2017) (per curiam) (unpublished); *United States v. Siegrist*, 595 F. App'x 666 (8th Cir. 2015) (per curiam) (unpublished); *United States v. Seay*, 620 F.3d 919 (8th Cir. 2015). In *Seay,* the court did not specifically invoke the language of *Barton* in the way the *Woolsey* court quoted that case. Instead, the court relied on the wisdom of "[o]ur sister circuits" in rejecting the defendant's as-applied challenge to Section 922(g)(3) and specifically cited cases which applied the two-step analysis utilized in most other circuits. *Seay*, 620 F.3d at 924 (citing *e.g.*, *United States v. Williams*, 616 F.3d 685, 690–94 (7th Cir. 2010); *Marzarella*, 614 F.3d at 89).

Although not explicit, *Woolsey* and its progeny rely heavily on the conceptual framework used in other circuits that the Third Circuit eventually fully described in *Binderup*. Rather than charting its own path, the language of *Woolsey* strongly indicates that the Eighth Circuit's analytical approach to as-applied challenges to Section 922(g) hews closely to the well-established two-step approach taken by other circuits. To be sure, the Eighth Circuit Court of Appeals has yet to conduct a comprehensive constitutional analysis of the statute. Instead, after determining that the defendant in each particular case cannot pass any form of scrutiny by distinguishing their circumstances "from those of persons historically barred from Second Amendment protection," the court simply declines to engage in more fulsome analysis. *Woolsey,* 759 F.3d at 909. By contrast, the placement of all burdens on the defendant in *Adams* is a sharp departure from how this circuit has handled not only Second Amendment challenges post-*Heller*, but other enumerated rights as well. Defendant's objection on this ground is **sustained.**

### 2.    *Defendant's As-Applied Challenge*

Although the Court reached a different conclusion than Judge Roberts as to which case controls the outcome here, his ultimate finding remains undisturbed. As the explication of the Second Amendment standard described above makes clear, defendant's conclusion that *Woolsey* established a definitive test comprised of two independent prongs is unfounded. Indeed, the plain language of *Woolsey* itself forecloses defendant's argument. After disposing of the defendant's facial argument, the *Woolsey* court, quoting itself in *Brown*, stated

> [The defendant] has not presented facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections. He does not allege, *for example,* that his stipulated prior felony conviction was for a non violent offense or that he is no more dangerous than a typical law-abiding citizen. [The defendant's] assertion that he possessed the gun for self defense is

> insufficient to successfully challenge his conviction under the felon in
> possession statute.

*Woolsey*, 759 F.3d at 909 (emphasis added) (internal citations and quotations omitted). To be fair, the Eighth Circuit did not have the benefit of the *Binderup* decision when deciding *Brown* or *Woolsey*. The court in *Binderup* went to great lengths to clarify and harmonize its decisions in *Marzarella* and *Barton*. The most logical interpretation of *Woolsey*, therefore, is that the Eighth Circuit elected to proceed with only as much analysis as was necessary to decide the issue before it. In adopting and applying the widely used analytical framework above, the court appears to have simply never been presented with a case that has made it past the first stage of analysis.

What *Woolsey* plainly did *not* do, however, was establish a completely new, two-prong "or" test that defendant now argues controls the outcome here. The portions of *Woolsey* he relies upon are not prongs of a test, as defendant theorizes. Rather, they are specific examples of the broader category of persons who may not have been historically barred from Second Amendment protections. This conclusion is clearly evident from the plain language of the quotation, namely, the words "for example" which precede the two categories that defendant contends are prongs of a test. Although there may be some room to argue over whether and to what extent defendant's conduct is protected or whether and how Section 922(g) violates the Second Amendment, there is no doubt that the test proposed by defendant is unsupported by either the text of *Woolsey* itself or any related caselaw.

Admittedly, defendant's arguments raise interesting questions of Second Amendment jurisprudence. Courts still wrestle with and disagree over significant aspects of this area of the law. *Compare New York State Rifle and Pistol Ass'n v. City of New York*, 883 F.3d 45 (2d. Cir. 2018) (applying unique form of heightened scrutiny and finding city licensing scheme constitutional), *with New York State Rifle and Pistol Ass'n*

*v. City of New York*, 140 S.Ct. 1525, (2020) (Alito, J., dissenting) (applying heightened scrutiny and finding challenged law unconstitutional). *But see Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) (arguing that categorical dispossession of all felons—violent and nonviolent—is not narrowly tailored and thus unconstitutional). The Court notes the significant disagreements in various courts over the precise reach of Section 922(g) and even over the appropriate degree of scrutiny to be applied. Those questions are ultimately foreclosed—to this Court, in any event—by precedent in this circuit.

For the time being, the Eighth Circuit Court of Appeals has elected to test as-applied challenges to Section 922(g) against the first prong of the widely adopted two-step test described above and, if the challenge fails at that stage, the court's inquiry proceeds no further. Applying that same standard, this Court finds that defendant has not met his burden of showing that his circumstances are distinguished from those of persons historically barred from firearm possession. Defendant is a felon. His past felonies—convictions for a third driving under the influence offense and for possessing a firearm as a felon—are undoubtedly dangerous offenses, if not violent in and of themselves. Defendant is therefore squarely in the category of persons historically barred from Second Amendment protections. Defendant's objection on this ground is **overruled.** Defendant's motion to dismiss is **denied**.

## V.     CONCLUSION

For the reasons stated above, defendant's objections are **sustained in part and overruled in part**.  (Doc. 40).  The Court **adopts with modification** Judge Roberts' Report and Recommendation (Doc. 37) and **denies** defendant's Motion to Suppress (Doc. 15) and Motion to Dismiss (Doc. 16).

**IT IS SO ORDERED** this 24th day of June, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa